DAVIS, Circuit Judge,
dissenting:
Today we are asked to rule on the constitutionality of core provisions of the Patient Protection and Affordable Care Act. Appellants advance several arguments against the Act, chief among them their claim that Congress exceeded its power when it sought to require all individuals (with narrow exceptions) to obtain a certain minimum of health insurance coverage starting in 2014. 26 U.S.C. § 5000A. In particular, appellants urge that the Commerce Clause, which authorizes Congress “To regulate Commerce ... among the several States,” U.S. Const. art. I, § 8, cl. 3, allows only regulation of economic activity. Thus, they contend, Congress cannot regulate appellants’ “decision not to purchase health insurance and to otherwise privately manage [their] own healthcare,” which they characterize as “inactivity in commerce,” Appellants’ Br. 1. They also contend that upholding the Act under the Commerce Clause would “create an unconstitutional national police power that would threaten all aspects of American life,” id. at 11, suggesting in particular that “Congress could require that people buy and consume broccoli at regular intervals” or that “everyone above a certain income threshold buy a General Motors automobile,” Appellants’ Reply Br. 9 (quoting Florida ex rel. Bondi v. Dep’t of Health and Human Servs., 780 F.Supp.2d 1256, 1288-89 (N.D.Fla.2011), aff’d in part and rev’d in part sub nom. Florida v. U.S. Dept. of Health & Human Servs., 648 F.3d 1235 (11th Cir.2011)). Appellants bring a similar facial challenge to the Act’s employer mandate, and they also assert Free Exercise, Establishment Clause, and Equal Protection claims against the Act.
My good colleagues in the majority hold that the Anti-Injunction Act strips us of jurisdiction in this case. For reasons I explain at length below, I disagree. As I reject the reasoning and the result of the majority’s jurisdictional analysis, I am entitled to reach the merits of appellants’ claims. Reaching the merits, I would hold that the challenged provisions of the Act are a proper exercise of Congress’s authority under the Commerce Clause to regulate the interstate markets for health services and health insurance. I do not believe that constitutional review of the Act requires courts to decide whether the Commerce Clause discriminates between activity and inactivity. But even if I were to assume appellants were “inactive,” I could not accept appellants’ contention that a distinction between “activity” and “inactivity” is vital to Commerce Clause analysis. I would therefore affirm the district court’s dismissal of appellants’ suit.
Appellants raise two major concerns about upholding the Act: first, they believe that individual liberty is infringed when the federal government is permitted to regulate involuntary market participants; second, they fear that our liberty *423 will be further eroded in the future, as a ruling sustaining the Act would permit Congress to establish arbitrary purchase mandates. Because I take these concerns very seriously, I explain at some length why the Act is a far more limited exercise of federal power than appellants fear.
I. Anti-Injunction Act
A. My View
The majority concludes that the Anti-Injunction Act (AIA) applies to the challenged provisions of the Affordable Care Act, depriving us of subject-matter jurisdiction. Although the parties argue that we have jurisdiction, “federal courts have an independent obligation to ... raise and decide jurisdictional questions that the parties either overlook or elect not to press.” Henderson ex rel. Henderson v. Shinseki, — U.S. —, —, 131 S.Ct. 1197, 1202, 179 L.Ed.2d 159 (2011).
Before today, nine federal judges had expressly considered the application of the Anti-Injunction Act, and all nine held it inapplicable to the Affordable Care Act’s mandates. See Thomas More Law Center v. Obama, 651 F.3d 529, 538-41 (6th Cir. 2011); Goudy-Bachman v. United States Dept. of Health & Human Servs., 764 F.Supp.2d 684, 695-97 (M.D.Pa.2011); Liberty University, Inc. v. Geithner, 753 F.Supp.2d 611, 627-29 (W.D.Va.2010); United States Citizens Ass’n v. Sebelius, 754 F.Supp.2d 903, 909 (N.D.Ohio 2010); Florida ex rel. McCollum v. United States Dept. of Health & Human Servs., 716 F.Supp.2d 1120, 1130-44 (N.D.Fla.2010); Thomas More Law Center v. Obama, 720 F.Supp.2d 882, 890-91 (E.D.Mich.2010); Virginia ex rel. Cuccinelli v. Sebelius, 702 F.Supp.2d 598, 603-605 (E.D.Va.2010). Although the two circuit courts that have considered challenges to the mandates have split, all six members of those panels agreed that the courts should reach the merits; only the Sixth Circuit panel thought it necessary to discuss the AIA. Florida v. U.S. Dept. of Health & Human Servs., 648 F.3d 1235 (11th Cir.2011) (reaching the merits without raising the applicability of the AIA); Thomas More Law Center, 651 F.3d at 538-41 (expressly holding the AIA does not apply). For the following reasons, I agree with these judges and would hold that the AIA does not strip us of jurisdiction in this case.
The Anti-Injunction Act, originally enacted in 1867, directs that “no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person,” certain enumerated exceptions aside. 26 U.S.C. § 7421(a).[1] Thus, we have jurisdiction only if the penalty provisions attached to the challenged mandates do not constitute “tax[esj” for purposes of the AIA.[2]
The Sixth Circuit recently held that the individual mandate’s penalty provision was not a “tax” within the meaning of the AIA. *424 Thomas More Law Center, 651 F.3d at 538- 41. Its reasoning is straightforward: Congress spoke only of “tax[es]” in the Anti-Injunction Act, while it deemed the amount owed by those in violation of the individual mandate a “penalty.” See id. at 539- 40; compare 26 U.S.C. § 7421(a) with id. § 5000A(b), (c), (e), (g). And Congress did not simply use the term “penalty” in passing: Congress refers to the exaction no fewer than seventeen times in the relevant provision, and each time Congress calls it a “penalty.”
In fact, Congress considered earlier versions of the individual mandate that clearly characterized the exaction as a “tax” and referred to it as such more than a dozen times. See H.R. 3962, § 501, 111th Cong. (2009) (“imposfing] a tax” in section entitled “Tax on individuals without acceptable health care coverage,” and repeatedly referring to this exaction as a “tax”); H.R. 3200, § 401, 111th Cong. (2009) (same); S. 1796, § 1301, 111th Cong. (2009) (“imposing] a tax” in section entitled “Excise tax on individuals without essential health benefits coverage,” and repeatedly referring to exaction as a “tax”). Congress deliberately deleted all of these references to a “tax” in the final version of the Act and instead designated the exaction a “penalty.” As the Supreme Court noted in INS v. Cardoza-Fonseca, “[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language.” 480 U.S. 421, 442-43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Thus, it seems odd for the majority to ignore Congress’s deliberate drafting decision to call the exaction a “penalty” rather than a “tax.”
When Congress has wished “penalties” to be treated as “taxes,” it has said so expressly. In Subchapter A of Chapter 68 of the Internal Revenue Code, Congress directed that “any reference in this title [Title 26 of the United States Code (the Internal Revenue Code) ] to ‘tax’ imposed by this title shall be deemed also to refer to the additions to the tax, additional amounts, and penalties provided by this chapter.” Id. § 6665(a)(1). Likewise, in Subchapter B of that chapter, Congress instructed that “any reference in this title to ‘tax’ imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.” Id. § 6671(a). Yet, Congress chose to place the individual mandate and its “penalty” provisions not in Chapter 68 but in Chapter 48, which contains no such instructions. Though Congress did provide that this penalty “be assessed and collected in the same manner as an assessable penalty under subchapter B of chapter 68,” and Chapter 68 “penalties” are treated as “taxes,” the term “assessment and collection like a tax” does not imply that the penalty should be treated as a tax for any and all other purposes. Id. § 5000A(g)(l). As the Sixth Circuit recently observed, “Congress said one thing in sections 665(a)(2) and 6671(a), and something else in section 5000A, and we should respect the difference.” Thomas More, 651 F.3d at 540.
“Where, as here, resolution of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.” Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Courts look to legislative history first to see whether it indicates that Congress intended a particular result and then, if not, to find evidence of the purposes of the statute. Cf. Dolan v. United States Postal Service, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) (“Interpretation of a word or phrase depends upon reading *425 the whole statutory text, considering the purpose and context of the statute.... ”). Even if the statutory text were unclear here, legislative history indicates that the AIA should not apply.
Legislative history of the Affordable Care Act reveals that Congress never considered application of the Anti-Injunction Act. Nowhere in the Act’s voluminous legislative history can I find a single reference to the AIA. And when members of Congress discussed the inevitable judicial review of the Affordable Care Act, no one appears to have contemplated that the AIA might bar such review for the five years, post-enactment, that would have to elapse before a tax refund suit could be brought.
Looking, then, to legislative purpose, it appears that immediate judicial review of the individual mandate would do little to frustrate the aims of the AIA. The Anti-Injunction Act was intended to “protect[ ] the expeditious collection of revenue.” South Carolina v. Regan, 465 U.S. 367, 376, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984). Revenue from the individual mandate’s penalty provision will not be assessed and collected until the year after the mandate becomes operative—2015. Judicial review of the mandate in 2011 most assuredly will not frustrate “the expeditious collection of revenue” four years later. I also note that Congress forbid the Internal Revenue Service from employing its primary enforcement mechanisms to collect this penalty: the IRS may not seek the institution of criminal prosecutions by the Justice Department or impose a lien or levy on an individual’s property for failure to pay the penalty. 26 U.S.C. § 5000A(g)(2). This indicates that Congress had scant concern for “the expeditious collection of revenue” from the penalty provision.
A failure to provide immediate judicial review in reliance on a rather strained construction of the AIA, on the other hand, might undermine the core purpose of the Affordable Care Act. In the absence of a conclusive ruling from the federal courts, some individuals may well decide for themselves that the Act is unconstitutional and thus can be ignored. In the case of an ordinary tax this would simply result in some lost revenue and the costs of tax prosecutions; here, it would push the nation farther from Congress’s goal of attaining near-universal health insurance coverage. And, as leaving the constitutionality of the Act unsettled would seem likely to create uncertainty in the health insurance and health care industries, which might depress these major sectors of the economy, it seems that application of the AIA would be at cross-purposes with the Act’s reforms. Thus, I believe that there is ample reason for me to conclude that Congress had no design that the Anti-Injunction Act might apply to the individual mandate’s penalty provisions.
The question of our jurisdiction over appellants’ challenge to the analogous penalty attached to the employer mandate presents a closer question. That exaction is termed “an assessable payment” in the provision that imposes it, but it is then twice referred to as a “tax” in later, qualifying provisions. Compare Id. § 4980H(a) with id. § 4980H(b)(2), (c)(7). “The ... ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.” Robinson v. Shell Oil Co., 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). Given these mixed references, and mindful of the Supreme Court’s warning in United States v. Am. Trucking Ass’ns, 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940), that “[t]o take a few words from their context and with them thus isolated to attempt to de *426 termine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute,” I find the text of the employer mandate provision ambiguous on the application of the Anti-Injunction Act.
Thus, I would again look to legislative history and Congressional purpose. Cf. SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 350-51, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (Jackson, J.) (explaining that our canons of statutory construction “long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy”). For the reasons stated above, I would hold that Congress did not intend the Anti-Injunction Act to block timely judicial review of the employer mandate provisions. Accordingly, I would hold that we have jurisdiction to consider all of appellants’ claims.
B. The Majority’s View
The majority’s contrary conclusion relies on two arguments, neither of which I find convincing. First, the majority contends that “the Supreme Court has repeatedly instructed that congressional labels have little bearing on whether an exaction qualified as a ‘tax’ for statutory purposes” and that “the Court has specifically found an exaction’s label immaterial to the applicability of the AIA,” displacing the ordinary methods of statutory interpretation with a functional analysis of the challenged exactions. Ante p. 404. Thus, in the majority’s view, “it is simply irrelevant what the 2010 Congress would have thought about the AIA; all that matters is whether the 2010 Congress imposed a tax.” Ante p. 410. Second, the majority asserts that “[t]he Supreme Court has concluded that the AIA uses the term ‘tax’ in its broadest possible sense” and thus that this functional analysis sweeps quite broadly: the majority holds that “the AIA prohibits a preenforcement challenge to any exaction that is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue.” Ante p. 402 (internal quotation marks and braces omitted).
1.
The majority’s functional approach hinges on its interpretation of two Supreme Court cases from 1922: Bailey v. George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922), and Lipke v. Lederer, 259 U.S. 557, 42 S.Ct. 549, 66 L.Ed. 1061 (1922). I read these cases differently from the manner in which the majority reads them. Because the majority’s view of George and Lipke brings these cases into conflict, I believe my approach, which harmonizes them, is preferable.
The majority asserts that in Lipke “the Court ... specifically found an exaction’s label immaterial to the applicability of the AIA.” Ante p. 404. The Lipke Court held that “[t]he mere use of the word ‘tax’ in an act primarily designed to define and suppress crime is not enough to show that within the true intendment of the term a tax was laid.” 259 U.S. at 561, 42 S.Ct. 549 (emphases added). That is, “[t]he mere use of the word ‘tax’ ” in a criminal statute—particularly where, as in the statute at issue in Lipke, the word “tax” is immediately followed by the word “penalty”—is not dispositive of Congress’s “true inten[t]” regarding application of the AIA. Id. This is an ordinary exercise in statutory interpretation, not an instruction from the Court to disregard Congressional des *427 ignations as “immaterial to the applicability of the AIA.” Ante p. 404.
The Court did go on to examine the function of the exaction, noting that “[w]hen by its very nature the imposition is a penalty, it must be so regarded,” but it did not do so in the course of an ordinary application of the AIA. Lipke, 259 U.S. at 561, 42 S.Ct. 549. Rather, it is clear that the Court considered the function of the exaction because that function (as a criminal penalty) was relevant to the Court’s due process concerns. It was to resolve this constitutional problem, not simply to construe .the word “taxes” in the AIA, that the Court looked to the exaction’s function. Thus, the Court reasoned,
Before collection of taxes levied by statutes enacted in plain pursuance of the taxing power can be enforced, the taxpayer must be given fair opportunity for hearing; this is essential to due process of law. And certainly we cannot conclude, in the absence of language admitting of no other construction, that Congress intended that penalties for crime should be enforced through the secret findings and summary action of executive officers. The guaranties of due process of law and trial by jury are not to be forgotten or disregarded.
Id. at 562, 42 S.Ct. 549 (emphasis added). This passage strongly indicates that the Court was applying the canon of constitutional avoidance, construing the exaction at issue together with the AIA so as not to run afoul of due process. Cf. South Carolina v. Regan, 465 U.S. 367, 398-400, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (O’Con-nor, J., concurring in the judgment) (relying on doctrine of constitutional avoidance to interpret the AIA not to apply to origin.1 jurisdiction of the Supreme Court). The functional analysis was required by the Court’s constitutional concerns, as due process is triggered when the penalty is criminal, whatever its designation by Congress. As the AIA was simply being interpreted to accord with the constitutional mandate of due process—which binds Congress and thus of course requires that we look beyond Congressional labels to the nature and function of the exaction—Lipke did not establish a new methodology for construing “taxes” under the AIA. Instead, it recognized that the term “taxes” in the AIA is flexible, like nearly all statutory language, and may admit to alternative constructions. And it affirmed that a court’s goal when applying the AIA, like any other statute, is to do so in accord with the “true intendment” of Congress. Id. at 561, 42 S.Ct. 549.
This reading of Lipke harmonizes it with the two Bailey cases. As the majority explains, the Supreme Court considered a tax refund suit in Bailey v. Drexel Furniture Co. and held the Child Labor Tax Law unconstitutional as a “penalty” rather than a “tax.” 259 U.S. 20, 38-39, 42 S.Ct. 449, 66 L.Ed. 817 (1922). The same day, in Bailey v. George, the Court dismissed, pursuant to the AIA (§ 3224, precursor to the modern AIA), a pre-collection suit alleging the Child Labor Tax Law was unconstitutional. 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816 (1922). The George Court’s reasoning is extremely brief (in a one-page opinion): “The averment that a taxing statute is unconstitutional does not take this case out of [the AIA].” Id. at 20, 42 S.Ct. 419. The question, of course, is why the statute, though an unconstitutional exercise of the taxing power per Drexel Furniture, is still “a taxing statute” for purposes of the AIA.
My answer is the more straightforward one: it constitutes a “taxing statute” for purposes of the AIA because it purported to be a taxing statute and appeared to be one on its face—that is, because it was designated as a taxing statute by Con *428 gress. See Drexel Furniture, 259 U.S. at 34, 42 S.Ct. 449 (noting exaction was called “Tax on Employment of Child Labor,” part of “An act to provide revenue ... ”). Thus, the Court provided no explanation because it relied on the most obvious reason for deeming the statute at issue a “taxing statute.” The majority disagrees, arguing that “the Court never mentioned the statutory label” in George and that “it [does not] seem plausible that the Court implicitly relied on that label, given that it had never before and has never since found an exaction’s label controlling for statutory purposes.” Ante p. 405
Under the majority’s approach, the George Court must have conducted a functional analysis of the exaction and determined that it qualified as a tax. Yet this supposed functional analysis appears nowhere in the opinion. It is difficult to believe that the Court would not bother to specify any criteria for determining when an exaction is functionally a tax, given that the Court had just held the statute not to qualify as a tax for constitutional purposes in Drexel Furniture. If the George Court were relying on anything beyond the face of the statute, surely the Court would have provided some explanation of why the enactment qualified as a tax under the AIA but not under the Taxing and Spending Clause.
More troubling still, the majority’s reading of George brings it into conflict with Lipke. Under the majority’s approach, the Court in George must have simply recognized that “the AIA ... [reaches] any exaction that is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue.” Ante 402 (internal quotation marks and braces omitted). But these criteria fail to distinguish the “penalty” in Lipke, which was held to be outside the AIA. The “penalty” in Lipke also met the majority’s criteria: the National Prohibition Act simply doubled taxes already assessed and collected by the Commissioner, 41 Stat. 305, 317-18 (1919), which were laid down in the Revenue Act of 1918 “on all distilled spirits,” and were “to be paid by the distiller or importer when withdrawn, and collected under the provisions of existing law,” 40 Stat. 1057, 1105, Title VI—Tax on Beverages, § 600(a). That the Court found the exaction tantamount to a criminal penalty does not change this.[3] Thus, by the majority’s understanding of the AIA, there should have been no room for constitutional avoidance, and the Court in Lipke should have held the AIA applicable and refused jurisdiction.[4]
*429 The majority seems to recognize that Lipke may appear problematic, but it contends that it is not. It argues that “Lipke held only that when Congress converts the tax assessment process into a vehicle for criminal prosecution, the Due Process Clause prohibits courts from applying the AIA.” Ante p. 406. That was the core holding of Lipke, yes, but the question is whether the Court’s construction of the AIA in reaching that holding accords with the majority’s rigid interpretative regime constructed ninety years later.[5] Under the majority’s proposed construction, the term “tax” in the AIA reaches all exactions which the Commissioner is empowered to collect. Ante pp. 402-03. Yet, the Lipke Court held that the AIA did not reach such an exaction. Though the majority would prefer that Lipke “create[d] only a narrow constitutional limitation” to the AIA, ante p. 406, the Court’s holding is simply not framed as creating an exception to the AIA. Rather, the Court explained that it “constru[ed]” the term “tax” in the AIA (in accord with “Congress[’s] in-ten[t]”) and held that it was not so broad. 259 U.S. at 561-62, 42 S.Ct. 549. The majority’s view of the AIA, and its corresponding interpretation of these cases, inescapably places George and Lipke in conflict.
My reading of these cases, which is fully consistent with my approach to the AIA, harmonizes them. Under my view of Lipke, the AIA’s “taxes” is recognized to be, like any statutory language, a flexible term that must be interpreted in accord with Congressional intent and, when applicable, bounding constitutional mandates. In many cases, Congress’s decision to designate something a “tax” will prove dispositive—indeed, the designation did so in Bailey v. George. Lipke simply reflects the recognition that Congress’s use of the word “tax” in an otherwise non-tax provision (followed closely by the word “penalty”) does not invariably mandate that the AIA be applied—constitutional concerns can override congressional designations. This is fully in accord with my view of the AIA and its relation to subsequent enactments, particularly an expansive programmatic enactment such as the ACA that would alter the fabric of many layers of American life.[6]
The majority cites several other cases for the proposition that we are to ignore Congressional designations when applying the AIA, instead asking only whether an exaction is intrinsically a tax according to its “nature and character.” Ante p. 404 (quoting Helwig v. United States, 188 U.S. 605, 613, 23 S.Ct. 427, 47 L.Ed. 614 (1903)). I will briefly discuss two of them.
Helwig v. United States, for instance, concerned the interaction of a statute that imposed “a further sum” when importers declared a value more than 10% lower than customs’ subsequent appraisal and a statute that gave federal district courts exclusive jurisdiction over “penalties” and *430 “forfeitures.” The passage the majority excerpted from is quite instructive:
Although the statute ... terms the money demanded as “a further sum,” and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. Congress may enact that such a provision shall not be considered as a penalty or in the nature of one, with reference to the further action of the officers of the government, or with reference to the distribution of the moneys thus paid, or with reference to its effect upon the individual, and it is the duty of the court to be governed by such statutory direction, but the intrinsic nature of the provision remains, and, in the absence of any declaration by Congress affecting the manner in which the provision shall be treated, courts must decide the matter in accordance with their views of the nature of the act.
188 U.S. 605, 612-13, 23 S.Ct. 427 (emphases added). Thus, the Court emphasized that it looked to “the nature and character of the enactment” only “in the absence of any declaration by Congress” giving direction to the court. Far from supporting the majority’s claim that “[t]he Supreme Court has repeatedly instructed that congressional labels have little bearing on whether an exaction qualifies as a ‘tax’ for statutory purposes,” Helwig indicates that Congressional labels that direct the court may of course be dispositive. Terming an exaction “a further sum” did not help the Court determine whether or not that sum was a “penalty”; but Congress’s expressly considering calling an exaction a “tax” and then deleting the dozens of references to a “tax” and instead designating it a “penalty” (as Congress did in the course of its enactment of the ACA) does help courts determine whether Congress wished us to view the exaction as a “tax” for purposes of the AIA.[7] Though Congress did not expressly reference the AIA here—and, judging from the legislative history, may well not have considered application of the AIA specifically—it did consider whether to attach all the trappings of a “tax” to the exaction (including, among many others provisions, the AIA), and decided instead to specify the ones it wanted. The AIA is not among them.
The majority’s second citation for that proposition, United States v. Reorganized CF & I Fabricators of Utah, Inc., 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), is much like Helwig. There the Court determined whether a “tax” imposed on certain funding deficiencies constituted an “excise tax” for Chapter 11 purposes (as “an excise tax” was accorded higher priority than ordinary claims). It prefaced its discussion by recognizing that “Congress could have included a provision in *431 the Bankruptcy Code calling [the relevant] exaction an excise tax ...; the only question is whether the exaction ought to be treated as a tax (and, if so, an excise) without some such dispositive direction.” Id. at 219, 116 S.Ct. 2106. Its ultimate conclusion considered legislative history of the exaction at issue and “conclude[d] that the 1978 Act reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context----” Id. at 224, 116 S.Ct. 2106. Here, where Congress provided one of the most direct signals it can of its intentions—it expressly considered calling the exaction a “tax” and ultimately decided not to do so—Helwig and Reorganized CF & I would direct us to follow Congress’s direction and treat an exaction denominated a “penalty” as a penalty and not as a tax for purposes of the AIA.
2.
Second, the majority’s approach relies upon its assertion that “[t]he Supreme Court has concluded that the AIA uses the term ‘tax’ in its broadest possible sense” and thus that “the AIA prohibits a preenforcement challenge to any exaction that is made under color of their offices by revenue officers charged with the general authority to assess and collect the revenue.” Ante p. 402 (internal quotation marks and braces omitted).
This definition is far from self-evident. As the majority concedes, taxes and penalties are distinguished in some federal statutory “contexts.” Ante p. 403 n. 4. In the very case discussed above, Reorganized CF & I Fabricators, which dates from 1996, the Court adopted these definitions for its “functional” inquiry of the exaction at issue: “A tax is an enforced contribution to provide for the support of government; a penalty ... is an exaction imposed by statute as punishment for an unlawful act.” 518 U.S. at 224, 116 S.Ct. 2106. The majority reasons that “[n]either the Secretary nor the Sixth Circuit cites a single case suggesting that [this distinction applies to the AIA].” Ante p. 403 n. 4. Of course, Lipke, on which the majority relies, is one major AIA case that distinguishes between taxes and penalties. And, as the Court in Reorganized CF & I Fabricators borrowed its definitions of “tax” and “penalty” from a “somewhat different context,” it appears that these definitions are not particularly context-specific. 518 U.S. at 224, 116 S.Ct. 2106. Thus, if a court is to perform a “functional examination” of its own, why would it not use these well-settled definitions, under which the Affordable Care Act’s exaction would clearly be a penalty (for noncompliance with the individual mandate)?
By my count, the majority puts forward three affirmative arguments favoring the “broadest possible” definition for the word “taxes” in the AIA: (1) Snyder v. Marks, 109 U.S. 189, 3 S.Ct. 157, 27 L.Ed. 901 (1883), established a broad definition of “tax” under the AIA; (2) the twin Bailey cases show that the AIA is “broader” than the taxing clause; and (3) the fact that the IRS grants the Secretary the authority to make “assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title” implies that the AIA, which generally protects the Government’s interest in effecting unfettered tax assessments, must apply to all exactions. 26 U.S.C. § 6201(a) (emphasis added). I find these arguments unpersuasive.
First, Snyder does not establish the broad definition the majority cites it for. The Court explains that “tax” “meant that which is in condition to be collected as a tax, and is claimed by the proper public *432 officers to be a, tax.” 109 U.S. at 192, 3 S.Ct. 157 (emphasis added). Thus, Snyder clearly makes relevant the Commissioner’s designation of an exaction and, reasonably viewed, requires that the Commissioner “claim[ ]” an exaction “to be a tax.” Here, of course, the Secretary of the Treasury is a party before us and supports Congress’s designation of the mandate as a “penalty” rather than a “tax.”[8]
Second, the Bailey cases have already been dealt with at length above. I agree that they show that the AIA is “broader” than the taxing clause when applied to exactions that are designated by Congress as “taxes ”—in the limited sense that they include some exactions that purport to be taxes yet are unconstitutional—but they do no more than that.
As for the majority’s final argument, it seems to require a logical leap. I reproduce the relevant paragraph for ease of reference:
The Court’s broad interpretation of the AIA to bar interference with the assessment of any exaction imposed by the Code entirely accords with, and indeed seems to be mandated by, other provisions of the Internal Revenue Code. The AIA does not use the term “tax” in a vacuum; rather, it protects from judicial interference the “assessment ... of any tax.” I.R.C. § 7421(a) (emphasis added). The Secretary’s authority to make such an “assessment ... of any tax” derives directly from another provision in the Code, which charges the Secretary with making “assessments of all taxes (including interest, additional amounts, additions to the tax, and assessable penalties) imposed by this title.” § 6201(a) (emphases added); see also § 6202 (“assessment of any internal revenue tax” includes assessment of “penalties”). Thus, for purposes of the very assessment authority that the AIA protects, Congress made clear that “penalties” (as well as “interest, additional amounts, [and] additions to the tax”) count as “taxes.” Congress must have intended the term “tax” in the AIA to refer to this same broad range of exactions. See Erlenbaugh v. United States, 409 U.S. 239, 243, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972) (“[A] legislative body generally uses a particular word with a consistent meaning in a given context.”).
Ante pp. 402-03 (large emphasis mine).
I agree, of course, that “for purposes of the [Secretary’s] assessment authority,” Congress made clear that the ‘penalties’ ... count as ‘taxes.’ ” Indeed, where Congress has wished “penalty” to be treated as a “tax,” it has said so. See, e.g., 26 U.S.C. §§ 6665(a)(2), 6671(a) (directing that “tax” be “deemed also to refer to ... penalties” in Chapter 68 of the Internal Revenue Code). It is not at all surprising that Congress has employed this shorthand when defining the Secretary’s authorities.
The problematic leap is this: simply because the AIA generally protects the Secretary’s assessment authority does not mean that the AIA must apply to all exactions. The many exemptions included in the AIA as currently codified show that Congress has often wished to exempt certain exactions from the AIA. As a matter of statutory interpretation, it seems improper for a court to insist that “taxes” means any exaction (despite the fact that *433 Congress does not say so) and thereby to undercut Congress’s deliberate decision to reject designating an exaction as a “tax” and instead to call it a “penalty.” Given that we have been cited no cases that would require such a large redrafting of the AIA—other “penalties” to which the AIA have been applied were placed in Chapter 68, which expressly directs that all references to “tax” in the IRC are to refer also to the Chapter’s “penalties”—I believe that this “broadest possible” interpretation of the AIA is unwarranted and unwise.
The majority appears to reject the legal force of sections 6665(a)(2) and 6671(a), arguing that section 7806(b) “forbid[s] courts from deriving any ‘inference’ or ‘implication’ from the ‘location or grouping of any particular section or provision or portion of this title.’” Ante p. 407. This puzzles me, as it is absolutely clear that sections 6665(a)(2) and 6671 have the force of law. Section 6665(a)(2) directs that “any reference in this title to ‘tax’ imposed by this title shall be deemed also to refer to ... penalties provided by this chapter.” This instructs courts that Congress wished to make the word “penalty” inclusive of the word “tax” in this particular chapter (Chapter 68). Congress remains free to do otherwise in other chapters; indeed, it chose not to do so in Chapter 48, in which the individual mandate is found. Giving force to section 6665(a)(2) in no way contradicts section 7806(b) by drawing a prohibited implication from the “location or grouping” of Internal Revenue Code (IRC) provisions. Section 7806(b) prohibits inferences drawn from the location or group itself; instructions can still flow from section 6665(a)(2) that are to apply only to a specified chapter. This seems to me to be beyond serious doubt. Likewise, section 7806(b) does not prohibit courts interpreting one provision of the IRC from looking to other provisions of the IRC and noting that, where Congress has desired a particular result, it has stated so. To suggest that a court cannot draw the traditional inference from Congress’s decision to define “penalty” as inclusive of “tax” in other chapters and its failure to do so here seems wholly unwarranted by section 7806(b).[9]
In the final analysis, the majority’s approach essentially imposes a elear-statement rule on Congress, making the AIA applicable to all exactions, regardless of statutory language and in disregard of apparent Congressional intent, unless Congress had the foresight to expressly exempt an exaction from the AIA. The majority concedes, as it must, that the 111th Congress could have exempted the individual mandate from the AIA, but it suggests that the only way Congress could avoid the AIA’s bar on immediate judicial review of the ACA is by amending the AIA itself to include an express exemption for the ACA or (in what amounts to the same thing) by referencing the AIA by name in the ACA. That is, the majority seems to believe that a elear-statement rule is operative here, and that absent a clear statement regarding the inapplicability of the AIA, it must apply to any and all exactions. Given that the Supreme Court has never recognized such a clear-statement . rule, it seems to me that this turns the ordinary principles of statutory interpretation on their head.
*434 As Justice Kennedy recently recognized for a plurality of the Court, dear-statement rules are designed to “avoid applications of otherwise unambiguous statutes that would intrude on sensitive domains in a way that Congress is unlikely to have intended had it considered the matter.” Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 139, 125 S.Ct. 2169, 162 L.Ed.2d 97 (2005) (plurality op.). Justice Kennedy even warned in his plurality opinion against “convert[ing] the clear statement rule from a principle of interpretive caution into a trap for an unwary Congress.” Id. That seems to be precisely what the majority does today.
Presumably because the majority believes such a clear-statement rule applies, it asserts that “[t]o infer an intent on the part of the 2010 Congress to implicitly exempt this pre-enforcement challenge from the AIA bar would be tantamount to inferring an implicit repeal of that bar.” Ante p. 410. But our case is nothing like implicit repeal cases like TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), which the majority cites in that paragraph. In Hill, the Court considered whether continued federal appropriations for a dam after notice that construction was being challenged under the Endangered Species Act worked an implicit repeal of the Act with respect to the dam. In an implicit repeal case, the Court is forced to consider whether Congressional action definitively to the contrary of an earlier enactment works an implied repeal. In our case, on the other hand, we are simply asking whether Congress created with the ACA the sort of exaction to which the earlier act (the AIA) applies. This requires us to construe both the word “taxes” under the AIA and the word “penalty” in the ACA, applying our ordinary tools of statutory interpretation. We look first to the text itself, and, after finding that it is at best ambiguous, we look to legislative history and Congressional purpose. Because the application of the AIA to the ACA is in doubt—this is precisely the question we are deciding sua sponte— our case is nothing like implicit repeal cases.
Of course, my approach fully recognizes that the AIA has legal force. But, as the AIA can undoubtedly be sidestepped by any Congress as it creates a new exaction (at the very least, in the majority’s view, by a clear statement that the AIA is not to apply), the AIA is non-binding on future Congresses. When courts determine the application of the AIA to the ACA, they are only considering the application of one Congressional enactment to a later one. Because one Congress cannot bind a later one, the 111th Congress was fully within its prerogative to indicate, even if only implicitly, that the AIA should not apply. See United States v. Winstar Corp., 518 U.S. 839, 872, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality op.) (quoting Blackstone for “the centuries-old concept that one legislature may not bind the legislative authority of its successors”). The independent legal force of the AIA does not spring from the fact that it can trap future, unwary Congresses, but rather from the fact that we must seek to harmonize its terms with that of future legislation. That is, the AIA is not binding on Congress, it is binding on us, the judiciary.
Finally, as for the majority’s suggestion that policy arguments favor its position because a contrary holding “might have serious long-term consequences for the Secretary’s revenue collection,” ante p. 412, I would simply note again that the Secretary of the Treasury is a party before us and argues that the AIA does not apply. Indeed, I cannot find a Supreme Court case where the AIA has been applied over the objection of the Secretary.
*435 3.
The majority suggests that the issue presented here is one of “context,” and I agree. The majority accepts “the Sixth Circuit’s general observation that there are ‘contexts’ in which the law treats ‘taxes’ and ‘penalties’ as mutually exclusive” and explains that “[t]he question here is whether the AIA is one of these ‘contexts.’ ” Ante p. 403 n. 4 (internal quotation marks omitted). To my mind, the proper question is not whether “taxes” and “penalties” are always “mutually exclusive” under the AIA, but whether Congress, in creating a later-enacted exaction, intended to create a “tax” for purposes of the AIA. But the more important question of “context” is this: whether, in light of the context provided by Congress’s deliberate decision to designate the individual mandate’s exaction a “penalty” rather than a “tax” and the evidence of Congress’s desire to erect no jurisdictional bar to immediate judicial review of the ACA, we should nonetheless interpret the ACA as creating a “tax” within the meaning of the AIA. My effort here, to marshal the historical, jurisprudential, interpretive, and, yes, commonsense factors necessary to answer this question, persuades me that we should not. Given this larger context, I do not believe that one interpretation of near century—old AIA cases—cases that fail to devote enough space to the AIA analysis to even spell out their reasoning— should carry the day. If the Supreme Court’s vacillations concerning the proper interpretation of the AIA teach us anything, they teach us that context matters.[10]
Because I do not believe that Lipke and George instruct courts to eschew our ordinary methods of statutory interpretation and I do not agree that the AIA reaches all exactions though by its terms it is limited to “taxes,” I cannot join the majority. Where Congress expressly rejected the term “tax” in favor of “penalty,” and where it appears that application of the AIA would do little to further the purposes of the AIA, but would do much to frustrate the Affordable Care Act’s reforms desired by the Congress that approved the Act, I would hold that the AIA does not strip us of jurisdiction. Thus, I would reach (and I do indeed reach) the merits of appellants’ challenges.
II. The Act
After a months-long national debate, the Patient Protection and Affordable Care Act was signed into law on March 23, 2010. Pub.L. No. 111-148, 124 Stat. 119, amended by The Health Care and Education Reconciliation Act of 2010, Pub.L. No. 111— 152, 124 Stat. 1029 (2010). The Affordable Care Act is comprised of a half-dozen initiatives designed to reduce the costs of health care and the number of Americans who remain uninsured.
First, the Act creates “health benefit exchanges” in each state, which are regulated to increase transparency concerning premium increases and claim denials and which offer market-based incentives tied to increases in efficiency and better health outcomes. 42 U.S.C. § 18031(e), (g).
*436 Second, the Act prevents insurers from rejecting applicants with preexisting conditions (the “guaranteed issue” requirement) and bars insurers from charging higher premiums to those with serious medical conditions or a history of past illness (the “community rating” requirement). Id. §§ 300gg-300gg-3.
Third, the Act makes more Americans eligible for Medicaid, and to many of those who earn too much to receive Medicaid it grants tax credits to subsidize the cost of insurance premiums and pledges federal dollars to reduce out-of-pocket expenses. Id. §§ 1396a(10)(A)(i)(VIII), 18071; 26 U.S.C. § 36B.
Fourth, the Act requires that individuals keep up “minimum essential [health insurance] coverage.” Id. § 5000A. In particular, it directs that “[a]n applicable individual shall for each month beginning after 2013 ensure that the individual, and any [applicable] dependent ..., is covered under minimum essential coverage for such month.” Id. Appellants term this the “individual mandate,” and it is the chief target of their suit. Appellants’ Br. 3. Congress found that hospitals provided $43 billion in uncompensated care to the uninsured in 2009, and that these costs were shifted onto insured individuals, “increas[ing] family premiums by on average over $1,000 a year.” 42 U.S.C. § 18091(a)(2)(F). It also found that, “[b]y significantly lowering the number of the insured, the [minimum coverage] requirement, together with the other provisions of th[e] Act, will lower health insurance premiums.” Id.
Congress created two religious exemptions to the individual mandate: a religious conscience exemption and a health-care sharing ministry exemption. 26 U.S.C. § 5000A(d)(2). I discuss the particulars of these exemptions in Part VIII, where I consider appellants’ First Amendment claims.
Fifth, the Act created tax incentives making it more affordable for small businesses to offer health insurance to their employees. Id. § 45R.
Finally, the Act required “applicable large employers ... to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan” if at least one full-time employee is receiving federal subsidies for health insurance. Id. § 4980H(a). Appellants call this the “employer mandate.” Appellants’ Br. 3.
Appellants Michele Waddell, Joanne Merrill, and Liberty University assert an array of constitutional challenges to the Act’s individual and employer mandates and request declaratory and injunctive relicf. They allege that the mandates are outside Congress’s Article I powers and that the individual mandate’s religious exemptions effect violations of the First Amendment’s Free Exercise and Establishment Clauses as well as the equal protection component of the Fifth Amendment’s Due Process Clause. Appellants’ chief contention is that the individual mandate was not validly enacted pursuant to Congress’s commerce power because it regulates what they call “inactivity.” Id. at 1. The district court carefully parsed appellants’ arguments and dismissed their suit pursuant to Federal Rule of Civil Procedure 12(b)(6), concluding that appellants had failed to state a legally sufficient claim. Liberty University, Inc. v. Geithner, 753 F.Supp.2d 611 (W.D.Va.2010). For the following reasons, I would affirm.
III. Constitutionality, Inactivity Aside
Putting aside appellants’ “inactivity” argument, to which I return in Parts IV and V, I first consider whether the Act is *437 otherwise authorized under Congress’s “power to regulate activities that substantially affect interstate commerce.” Gonzales v. Raich, 545 U.S. 1, 16-17, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005). In particular, I ask whether the Act runs afoul of the teachings of United States v. Lopez and United States v. Morrison, two cases in which the Supreme Court enforced limits on the Commerce Clause so as not to “convert congressional authority under the Commerce Clause to a general police power.” United States v. Lopez, 514 U.S. 549, 567, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); see United States v. Morrison, 529 U.S. 598, 617-19, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).
A. Lopez and Morrison
In Lopez and Morrison the Supreme Court struck down two congressional enactments because the objects of regulation—the possession of guns in school zones in Lopez, violence against women in Morrison—were noneconomic. Affirming that “Congress’ commerce authority includes the power to regulate those activities having substantial relation to interstate commerce, ie., those activities that substantially affect interstate commerce,” Lopez held that gun possession in schools did not substantially affect interstate commerce. 514 U.S. at 559-60, 115 S.Ct. 1624 (internal citations omitted). The Court worried that to identify the effect of guns in schools on interstate commerce it “would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.” Id. at 567, 115 S.Ct. 1624. If gun possession in schools were held to be substantially related to interstate commerce simply because such incidents harmed our “national productivity,” then “Congress could regulate any activity that it found was related to the economic productivity of individual citizens” and it would be “difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign.” Id. at 564, 115 S.Ct. 1624.
Morrison further clarified the holding of Lopez. The Court explained that “a fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that ease.” 529 U.S. at 610, 120 S.Ct. 1740. Without “express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone,” the Court refused to find a substantial effect upon interstate commerce, as it believed “the link between gun possession and ... interstate commerce was attenuated.” Id. at 612, 120 S.Ct. 1740. The Court noted that it has “upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.” Id. at 613, 120 S.Ct. 1740. Because the Morrison Court found that “[gjender-motivated crimes of violence are not, in any sense of the phrase, economic activity” and that their effects on interstate commerce (many of which were expressly enumerated by Congress) are “attenuated,” it struck down the challenged congressional regulation of these crimes. Id. at 613, 615, 120 S.Ct. 1740. As it did in Lopez, the Court emphasized that the “regulation ... of intrastate violence ... has always been the province of the States” and affirmed that “[t]he Constitution requires a distinction between what is truly national and what is truly local.” Id. at 617-18, 115 S.Ct. 1624.
Without doubt, appellants are correct to insist that Lopez and Morrison remind us that any formulation of the Commerce Clause must admit to limiting principles that distinguish the “truly national” from *438 the “truly local.” But the concern directly animating Lopez and Morrison—the non-economic character of the regulated activities—is not present in this case, where the failure to obtain health insurance is manifestly an economic fact with direct effects on the interstate markets for both health insurance and health services. Cf. Thomas More, 651 F.3d at 543-46 (Martin, J.); Florida, 648 F.3d at 1340-41, 1353-54 (Marcus, J., dissenting).
Nor can it be said that health insurance or health services have “always been the province of the states” in the way that education, family law, and criminal law have been. Morrison, 529 U.S. at 618,120 S.Ct. 1740. Since the Social Security Act of 1965, Pub.L. No. 89-97, 79 Stat. 286, established Medicare and Medicaid benefits, the federal government has been the single largest provider in the interstate health insurance market and the largest purchaser in the health services market. Federal dollars have accounted for more than one-quarter of all health spending each year since 1974; in 2008, Americans spent $2.3 billion on health services, of which the federal government paid more than $815 million—nearly 35%. Ctrs. for Medicare & Medicaid Servs., National Health Expenditure Amounts by Type of Expenditure and Source of Funds: Calendar Years 1965-2019. The year 1974 also saw the passage of the Employee Retirement Income Act (ERISA), which has a “broadly worded” and “clearly expansive” preemption provision. 29 U.S.C. § 1144(a); Egelhoff v. Egelhoff ex rel. Breiner, 532 U.S. 141, 146, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). Through ERISA, as well as later enactments like the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936, the federal government has come to occupy much of the field of the regulation of health benefits, and many state and local attempts to regulate health insurance have been held preempted. See, e.g., Retail Industry Leaders Ass’n v. Fielder, 475 F.3d 180 (4th Cir.2007) (holding Maryland’s Fair Share Health Care Fund Act, which regulated employer health care spending, preempted by ERISA, as “ERISA establishes comprehensive federal regulation of employers’ provisions of benefits to their employees”); but see Metropolitan Life Ins. Co. v. Mass., 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (holding that state mandated-benefit law survives ERISA preemption as a law that “regulates insurance, banking, or securities” within the meaning of ERISA’s savings clause). Given nearly half a century of extensive federal involvement in the national health insurance and health services sectors, it seems clear that Lopez and Morrison’s interest in protecting areas of traditional state sovereignty is not directly implicated.
That said, Lopez and Morrison do remind us that the scope of the Commerce Clause is finite and that its jurisprudence must admit to bounding principles. Thus courts must assure themselves that upholding the Act under the Commerce Clause would not effectively create a federal police power.
B. Substantial Effects
Appellants argue that if we were to hold that failure to obtain insurance substantially affects interstate commerce, we would be forced to find that the failure to purchase any marketed product substantially affects interstate commerce. Thus, they quote Florida ex rel. Bondi, where the district court for the Northern District of Florida found the Act unconstitutional in part because it believed that a Commerce Clause broad enough to authorize the Act must also support purchase mandates for broccoli or GM cars. Appellants’ Reply Br. 9 (quoting Bondi, 780 F.Supp.2d at *439 1288-89). The Eleventh Circuit, upholding the district court on that point, expressed similar fears that there are no “cognizable, judicially administrable limiting principles.” Florida, 648 F.3d at 1298. This is not so.
I begin by noting that whether failure to purchase insurance substantially affects interstate commerce relies on a great number of factual determinations. These are to be made not by the courts but by Congress, an institution with far greater ability to gather and critically evaluate the relevant information. As the Supreme Court noted in Raich, “[i]n assessing the scope of Congress’ authority under the Commerce Clause, ... [our] task ... is a modest one. We need not determine whether respondents’ activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a ‘rational basis’ exists for so concluding.” 545 U.S. at 22, 125 S.Ct. 2195.
The Act’s effects on interstate commerce depend in large part on an unusual feature of the health care market. By federal law, a hospital participating in Medicare must stabilize any patient who arrives at its emergency room, regardless of the patient’s ability to pay for treatment, Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd(b)(l), and many states impose similar requirements, see, e.g., H.R.Rep. No. 99-241(111), at 5 (1985), reprinted in 1986 U.S.C.C.A.N. 726, 726-27 (noting that “at least 22 states have enacted statutes or issued regulations requiring the provision of limited medical services whenever an emergency situation exists” and that “many state court rulings impose a common law duty on doctors and hospitals to provide necessary emergency care”). As a result, the uninsured often receive care that they are unable to pay for: in 2008, hospitals provided $43 billion in uncompensated care to the uninsured. 42 U.S.C. § 18091(a)(2)(F). To cope with these costs, hospitals increase the price of health care services, which in turn leads to rising health insurance premiums; Congress found that “[t]his cost-shifting increases family premiums by on average over $1,000 a year.” Id.
Recognizing these direct effects on the health insurance and health services markets does not require us to “pile inference upon inference” in the way linking noneconomic acts like the possession of guns in schools or gender-motivated violence to interstate commerce might have done in Lopez and Morrison. Lopez, 514 U.S. at 567, 115 S.Ct. 1624; see Morrison, 529 U.S. at 615, 120 S.Ct. 1740. In Lopez, the Court rejected the Government’s argument that gun possession in schools substantially affected interstate commerce due to the general “costs of crime” or because “the presence of guns in schools poses a substantial threat to the education process,” which “in turn, will result in a less productive citizenry.” 514 U.S. at 564, 115 S.Ct. 1624. Likewise, the Court rejected Congress’s findings in Morrison because they “follow[ed] the but-for causal chain from the initial occurrence of violent crime ... to every attenuated effect upon interstate commerce,” chiefly “deterring potential victims” from interstate travel, employment, general commercial transactions, “diminishing national productivity, increasing medical and other costs, and decreasing the supply of and demand for interstate products.” 529 U.S. at 615,120 S.Ct. 1740 (quoting H.R.Rep. No. 103-711, at 385 (1990), reprinted in 1994 U.S.C.C.A.N. 1839, 1853). Where the proffered “substantial effects” in Lopez and Morrison were attenuated, here the effects are direct: considered as a class (per Wickard and Raich’s aggregation principle, see Wickard v. Filburn, 317 U.S. 111, 127-28, 63 S.Ct. 82, 87 L.Ed. 122 (1942); Raich, 545 U.S. at 22, 125 S.Ct. 2195; post pp. *440 440-41), those who fail to purchase health insurance will seek and receive medical care they cannot afford; the cost of that care ($43 billion in 2008) is borne by the hospitals, which are forced to increase the price of health care services.
And recognizing that the uninsured’s passing on $43 billion in health care costs to the insured constitutes a substantial effect on interstate commerce in no way authorizes a purchase mandate for broccoli or any other vegetable. The health care market is unique in that its product (medical care) must be provided even to those who cannot pay, which allows some (the uninsured) to consume care on another’s (the insured’s) dime. Here the substantial effect on commerce comes not from simply manipulating demand in a market, as it would in the case of a broccoli or GM car mandate, but from correcting a massive market failure caused by tremendous negative externalities. Thus, we need not decide today whether the reasoning of Wickard and Raich, which were both concerned in part about limiting supply in interstate markets for fungible goods, extends to artificially inflating demand via a purchase mandate. See Wickard, 317 U.S. at 128, 63 S.Ct. 82 (recognizing that even wheat grown for home consumption “overhangs the market and if induced by rising prices tends to flow into the market and check price increases”); Raich, 545 U.S. at 19, 125 S.Ct. 2195 (noting that “high demand in the interstate market”—and consequent higher prices—is likely to “draw [home consumed] marijuana into that market”).
For these reasons, I would hold that the failure to obtain health insurance substantially affects the interstate markets for health insurance and health care services. Accord Thomas More, 651 F.3d at 544-46 (Martin, J.); id. at 556-58 (Sutton, J.); Florida, 648 F.3d at 1353-54 (Marcus, J., dissenting).
IV. Universal Participation in the Health Care Market
Nor need I decide today whether the Commerce Clause discriminates between activity and inactivity. Appellants concede that virtually all persons will voluntarily enter into the interstate health services market in their lifetimes, and they concede further, as they must, that this constitutes activity in commerce. Yet appellants insist that the Commerce Clause requires Congress to adopt an extremely narrow time-horizon: it may regulate persons seeking health care, but only once they have sought it. Appellants’ Br. 34. A faithful application of Wickard’s and Raich’s teachings requires us to reject this contention.
Wickard introduced the aggregation principle into Commerce Clause jurisprudence: “That appellee’s own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial.” 317 U.S. at 127-28, 63 S.Ct. 82. Raich reaffirmed this approach, noting that Commerce Clause analysis looks to the regulated “activities, taken in the aggregate.” 545 U.S. at 22, 125 S.Ct. 2195.
Further, Raich emphasized that
Congress [need not] legislate with scientific exactitude. When Congress decides that the “total incidence” of a practice poses a threat to a national market, it may regulate the entire class. See United States v. Perez [Perez v. United States], 402 U.S. [146,] at 154-55 [91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) ] (“[W]hen it is necessary in order to prevent an evil.to make the law embrace more than the precise thing to be prevented it may do so.”). In this vein, we *441 have reiterated that when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.
Id. at 17, 125 S.Ct. 2195 (some internal quotation marks and citations omitted).
Under Wickard and Raich, we are to take the view of the legislators, not those who are regulated. Courts look at the aggregated impact of an activity, not the impact of individuals; the Commerce Clause authorizes the regulation of an “entire class,” regardless of “the de minimis character of individual instances.” Id. We are to put aside “the mechanical application of legal formulas” and look instead to “the actual effects of the activity in question upon interstate commerce.” Wickard, 317 U.S. at 120, 124, 63 S.Ct. 82. Indeed, it bears repeating, our task in deciding Commerce Clause challenges “is a modest one” in which we ask “only whether a ‘rational basis’ exists” for Congress to find a substantial effect on interstate commerce. Id. at 22, 125 S.Ct. 2195.
Considering that hospitals are required to provide certain care to the uninsured, that illness and accidents are nothing if not unpredictable, and that the costs of medical care are often catastrophic, I have no hesitation in concluding the Congress rationally determined that addressing the $43 billion annual cost-shifting from the uninsured to the insured could only be done via regulation before the uninsured are in need of emergency medical treatment. Wickard and Raich teach that we are to take the longer view of legislators; it is difficult to imagine that Commerce Clause analysis would aggregate individuals and allow regulation of entire classes but then, when legislators confront a problem requiring a remedy before emergencies (and their ever-growing costs) occur, refuse to permit them to adopt the time-horizon necessary to enact a solution. Accord Florida, 648 F.3d at 1339-40 (Marcus, J., dissenting).
Thus, as Congress rationally found virtually universal participation in the interstate health care market over the course of residents’ lifetimes, the Act does not present an issue of congressional regulation of inactivity. Accord Thomas More, 651 F.3d at 548-49 (Martin, J.); id. at 559-62 (Sutton, J.); Florida, 648 F.3d at 1339-41 (Marcus, J., dissenting). Rather, courts are asked to pass on regulation of voluntary participation in the interstate health care market that, to be effective, must be preemptive. As it is clear that the regulated behavior substantially affects interstate commerce and appellants bring no other challenge to Congress’s authority under the Commerce Clause, I would hold the Act to be a proper exercise of congressional power.
V. Regulating Inactivity
But even if I were to assume that the uninsured are, in appellants’ phrase, “inactive in commerce,” I would be bound to uphold the Act. Despite appellants’ several arguments, the Commerce Clause is not offended by the regulation of “inactivity” or, in proper circumstances, by a purchase mandate.
Appellants urge that the Act is an “unprecedented attempt to force private citizens who have decided not to participate in commerce to engage in commerce by mandating that they purchase ... health insurance .... ” Appellants’ Br. 3. This argument presents two distinct questions: (1) “[w]hether Congress has authority under the Commerce Clause to regulate a private citizen’s inactivity in commerce”; and (2) whether such regulation can include “forcfing] [a] citizen to participate in commerce by mandating that she purchase a [commodity] ... or pay a penalty for non *442 compliance.” Id. at 1. I consider these questions in turn.
A. Regulating “Inactivity in Commerce”
Appellants characterize Mss. Waddell’s and Merrill’s “decision not to purchase health insurance and to otherwise privately manage her own healthcare” as “inactivity in commerce,” which they claim is beyond the reach of the Commerce Clause. Id. at 1. As the following brief review of the case law will show, this broader Commerce Clause challenge— whether it reaches non-market participants (those “inactiv[e] in commerce”)— has already been litigated. The Supreme Court’s “case law firmly establishes” that Congress may regulate those who have opted not to participate in a market when their self-provisioning, considered in the aggregate, “substantially affect[s]” an interstate market. Raich, 545 U.S. at 17, 125 S.Ct. 2195. After explaining why appellants’ broader challenge is foreclosed, I consider the far narrower challenge to the Act that survives.
1. Regulating Non-Market Participants
Nearly seventy years ago, in the famous case of Wickard v. Filbum, the Supreme Court upheld Congress’s power under the Commerce Clause to regulate Mr. Filburn’s private, noncommercial production of wheat. The Court squarely confronted the question: it began its discussion by noting that “[t]he question would merit little consideration ... except for the fact that this Act extends federal regulation to production not intended in any part for commerce but wholly for consumption on the farm.” 317 U.S. at 118, 63 S.Ct. 82. Just six years ago, the Court reaffirmed Wickard’s vitality in Raich, explaining,
Our case law firmly establishes Congress’ power to regulate purely local activities that are part of an economic ‘class of activities’ that have a substantial effect on interstate commerce. As we stated in Wickard, “even if appellee’s activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce.”
Raich, 545 U.S. at 17, 125 S.Ct. 2195 (quoting Wickard, 317 U.S. at 125, 63 S.Ct. 82) (emphasis added). The Raich Court made clear that “Congress can regulate purely intrastate activity that is not itself ‘commercial,’ in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity.” Id. at 18, 125 S.Ct. 2195. Applying this principle, the Court upheld the regulation of individuals who grew marijuana solely for “home consumption”—that is, it allowed Congress to regulate individuals who deliberately chose not to participate in commerce. Id.
Thus, appellants’ true quarrel with the Act is more limited than their language sometimes suggests. With subheadings like “Wickard does not support the district court’s conclusion that private economic decisions can be regulated under the Commerce Clause,” appellants’ briefs muddy their real point. Appellants’ Br. 20. As just described, it is well settled that Congress may regulate the private, noncommercial economic activities of non-market participants when their self-provisioning (growing wheat or marijuana for themselves) substantially affects an interstate market. Appellants contend that this “firmly established]” Commerce Clause law, Raich, 545 U.S. at 17, 125 S.Ct. 2195, is inapplicable because Wickard and Raich “involved voluntary activity, whereas the Act regulates voluntary inactivity.” Appellants’ Br. 19. To the extent that “voluntary inactivity ” again suggests deliber *443 ate non-participation in the market, this fails to distinguish Raich; yet appellants also seem to be raising a different point. “[I]t was the fact that Mr. Filburn actively grew wheat beyond the quota, even if for personal use, that was significant in Wickard,” as “it was that activity that constituted economic activity. By contrast, [appellants] have exerted no effort and used no resources.” Id. at 21, 125 S.Ct. 2195. It is this “distinction between activity and inactivity,” id. at 19, 125 S.Ct. 2195— absolute inactivity, not just inactivity (non-participation) in commerce—that carries the true thrust of appellants’ argument.
2. Regulating the “Inactive”
Before I can consider this narrower argument, I must be sure I understand exactly what appellants mean by it. Appellants say that “Mr. Filburn actively grew wheat beyond the quota, even if for personal use” while Ms. Waddell and Mrs. Merrill “have exerted no effort and used no resources.” Appellants’ Br. 21. But appellants expressly state that “Miss Wad-dell and Mrs. Merrill have voluntarily and deliberately decided not to purchase health insurance, but to instead save for and privately manage health carey Id. at 10 (emphasis added). It is not clear why “sav[ing] for and privately managing] health care,” a species of what economists call “self-insurance,”[11] requires neither “effort” nor “resources”—in fact, one would imagine that “sav[ing]” requires “resources” (namely, money) and that “manag[ing]” requires some “effort.” Id. at 10, 21. Though, unlike wheat and marijuana, insurance is intangible, appellants do not suggest that interstate markets in intangible goods or services are less subject to regulation under the Commerce Clause than markets in tangible goods; thus, it is difficult to see why the legal import of the appellants’ “sav[ing]” and “managing]” should differ from that of Mr. Filburn’s sowing and harvesting.
But even if appellants had said nothing about saving and managing and I accepted that Ms. Waddell and Mrs. Merrill had truly “exerted no effort and used no resources” with respect to health insurance—that is, that they had taken no steps to self-insure—it is difficult to make out the legal relevance of this point. Mr. Filburn and Ms. Raich deliberately chose to meet their own needs rather than enter commerce and purchase goods on the market and thus they, too, “exerted no effort and used no resources” in connection to the relevant markets; why are they more susceptible to Commerce Clause regulation than appellants simply because they privately exerted effort and expended resources for a noncommercial end?
Appellants have provided no express answer, but one is implicit in their arguments: in choosing to act, even privately, with notice of regulation, one can be said to consent or at least submit to that regulation. Under this view, Wickard and Raich are distinguishable because they *444 concerned regulated domains which individuals voluntarily entered upon the commencement of some “activity.” Thus, appellants’ complaint that “appellants in Raich could avoid Congress’ reach by not manufacturing or possessing marijuana, but here the Appellants cannot avoid Congress’ reach even if they are not doing anything.” Appellants’ Br. 19. Appellants express concern throughout their brief about allowing Congress to “regulate [people] because they are legal citizens who merely exist,” id. at 20;[12] likewise, the Eleventh Circuit majority worries that “[individuals subjected to this economic mandate have not made a voluntary choice to enter the stream of commerce.... ” Florida, 648 F.3d at 1291-92. So I will consider the Commerce Clause ramifications of regulating “everyone.”
3. Federalism & Regulations Affecting Everyone
I am aware of no “substantial effect” case, in more than a century of Commerce Clause jurisprudence, that looks beyond the class of activities regulated to the class of persons affected. And this is unsurprising, as the dispositive question is whether the object of regulation substantially affects interstate commerce; what the affected persons have done to consent (or not) to the regulation is obviously irrelevant to that inquiry. Appellants claim that their liberty concern springs from the principles of federalism rather than black-letter Commerce Clause law. Though these principles serve to protect state sovereignty and the resulting division of power helps to secure our liberty, federalism is not an independent font of individual rights.
As Justice Kennedy explained in his concurrence in Lopez, “it was the insight of the Framers that freedom was enhanced by the creation of two governments, not one,” as power could be split between state and federal governments even before each government’s powers were further separated among legislative, executive, and judicial departments. 514 U.S. at 576, 115 S.Ct. 1624. Thus, “[s]tate sovereignty is not just an end in itself: ‘Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.’ ” New York v. United States, 505 U.S. 144, 181, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (quoting Coleman v. Thompson, 501 U.S. 722, 759, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (Blackmun, J., dissenting)). Federalism “enhanee[s]” our liberty by disaggregating power; it helps to secure all our individual rights, but it does not create new ones. The Supreme Court’s recent decision in Bond v. United States, which granted an individual criminal defendant standing to challenge a federal statute on the grounds that it usurped powers reserved to the states and which discussed at length the ways in which federalism protects individual liberty, is not to the contrary. 564 U.S.—,—, 131 S.Ct. 2355, 2364, 180 L.Ed.2d 269 (2011). Appellants provide no support for their suggestion that some novel, heretofore unknown, individual right can spring from the principles of federalism.
Federalism was properly invoked in Lopez and Morrison, where, to police the division of authority between state and federal governments, the Court struck down federal regulation of noneconomic activity within “areas such as criminal law enforcement or education where States historically have been sovereign.” Lopez, *445 514 U.S. at 564, 115 S.Ct. 1624; see Monison, 529 U.S. at 599, 120 S.Ct. 1740. Lopez and Morrison’s concern about the loss of state authority within areas traditionally reserved to the states implicates the division of power between state and federal governments and thus goes to the very core of federalism. Appellants’ individual liberty concerns do not. Appellants suggest that allowing the Act to touch all U.S. residents, whether or not they have voluntarily entered a regulated domain, “threatens ... the bedrock concept[ ] of ... individual freedom.” Appellants’ Br. 11-12. Federalism does not speak to this issue.
Nor does any recognized individual right. Appellants’ rhetoric sometimes suggests a generalized right to be left alone; but outside of a limited right to privacy concerning “the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy,” including those “relating to marriage, procreation, contraception, family relationships, child rearing, and education,” Planned Parenthood of Se. Penn, v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), no such right exists. And any such right springing from substantive due process would bind the states under the Fourteenth Amendment as well as the federal government under the Fifth, placing universal regulation outside the reach of any government.
Moreover, an extensive body of federal laws, many passed pursuant to the Commerce Clause, targets all U.S. residents: federal criminal law. Indeed, Raich itself concerned the Controlled Substances Act and the noncommercial production and consumption of marijuana; nowhere in Raich did the Court intimate concern that the federal government was regulating the drug use of “everyone ... just for being alive and residing in the United States.” Bondi, 780 F.Supp.2d at 1284. Though penalties do not attach until someone has violated the statute, the same is true of the Act’s regulation. Of course, appellants suggest that compelling action is less legitimate under the Commerce Clause than prohibiting action. I take up that question next.
VI. Compelling Action
Having established that the regulation of “inactivity in commerce” does not offend the Commerce Clause, I consider whether federal commerce regulation can properly “force [a] citizen to participate in commerce by mandating that she purchase a [commodity] ... or pay a penalty for noncompliance.” Appellants’ Br. 1.
As I explained at length above, the Supreme Court has taught that an enactment is authorized by the Commerce Clause where Congress could rationally conclude that the object of regulation substantially affects interstate commerce. This inquiry looks only at the relation between the object of regulation and interstate commerce; the content of the regulation—what it compels or prohibits—is irrelevant. Indeed, it has long been recognized that “[t]he power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution.” Wickard, 317 U.S. at 124, 63 S.Ct. 82 (quoting United States v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726 (1942)); cf. Raich, 545 U.S. at 29,125 S.Ct. 2195 (“[S]tate action cannot circumscribe Congress’ plenary commerce power.”). The Necessary and Proper Clause makes clear that we are to defer to Congress with respect to the means it employs to effectuate legitimate ends. U.S. Const. art. I, § 8, cl. 18. In combination with the Commerce Clause, it empowers Congress “ ‘to take all measures necessary or appropriate *446 to’ the effective regulation of the interstate market.” Raich, 545 U.S. at 38, 125 S.Ct. 2195 (Scalia, J., concurring) (quoting Shreveport Rate Cases, 234 U.S. 342, 353, 34 S.Ct. 833, 58 L.Ed. 1341 (1914)).
But even if it were appropriate to review the method of regulation Congress has chosen to employ, I would find that the individual mandate fits well within the range of acceptable commercial regulations.
A. The Act Does Not Compel Citizens to Enter Commerce
I first note that the Act does not “force” any citizen to enter commerce. Appellants’ Br. 1. Instead, residents are given a choice between obtaining health insurance (by market purchase or otherwise) and paying a non-punitive tax penalty that, by law, is capped at “the national average premium for qualified health plans which have a bronze level of coverage.” 26 U.S.C. § 5000A(e)(l)(B); see id. at § 5000A(b)(l). As the average cost of providing the most basic insurance, this amount should roughly approximate the expected costs to the regulatory scheme (in the form of higher premiums) occasioned by an individual’s failure to procure insurance. Because the uninsured effectively force the rest of the nation to insure them with respect to basic, stabilizing care, this penalty is something like a premium paid into the federal government, which bears a large share of the shifted costs as the largest insurer in the nation.
B. History of Compelled Purchases
Even if the individual mandate were properly characterized as compelling residents to enter the market, this has long been an acceptable form of regulation under the Commerce Clause. For instance, the Federal Motor Carrier Safety Administration, acting pursuant to the Motor Carrier Act of 1980, requires that motor carriers purchase either liability insurance or a surety bond in order to ensure that they are able to pay for damage they may cause. See 49 C.F.R. § 387. And the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) requires that the owner of property contaminated by a hazardous substance “provide removal or remedial action”—likely requiring resort to the market—on pain of liability for punitive damages, even where the owner bears “no[] culpability or responsibility for the contamination” and indeed is entirely “passiv[e].” 42 U.S.C. § 9607(c)(3); Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 846-47 (4th Cir.1992). CERCLA has survived all Commerce Clause challenges, and it was expressly held a proper exercise of Congress’s Commerce Clause power by the Second Circuit Court of Appeals. See Freier v. Westinghouse Elec. Corp., 303 F.3d 176, 203 (2d Cir. 2002), cert. denied, 538 U.S. 998, 123 S.Ct. 1899, 155 L.Ed.2d 824 (2003); cf. United States v. Olin Corp., 107 F.3d 1506, 1511 (11th Cir.1997) (holding CERCLA constitutional Commerce Clause legislation as applied to appellants).
Wickard itself suggests that compelled purchases are permissible. The Court explained:
It is said, however, that this Act, forcing some farmers into the market to buy what they could provide for themselves, is an unfair promotion of the markets and prices of specializing wheat growers. It is of the essence of regulating that it lays a restraining hand on the self-interest of the regulated and that advantages from the regulation commonly fall to others____ And with the wisdom, workability, or fairness, of the plan of regulation we have nothing to do.
*447 317 U.S. at 129, 63 S.Ct. 82 (emphasis added). When describing how noncommercial wheat production decreased demand for market wheat, the Court explained that it “forestall[ed] resort to the market” and “supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market.” Id. at 127, 128, 63 S.Ct. 82. Though Wickard did not involve an express purchase mandate, the Court understood that Mr. Filburn was effectively being “forcfed] ... into the market to buy” wheat when it rejected his Commerce Clause challenge. Id. at 129, 63 S.Ct. 82.
C. Compelled Purchases as Government’s Core Function
Finally, I pause to consider why purchase mandates—whether they be for health insurance or broccoli-occasion such fear of federal aggrandizement. Cf. Thomas More, 651 F.3d at 564 (conveying author’s “lingering intuition—shared by most Americans, I suspect—that Congress should not be able to compel citizens to buy productions they do not want”) (Sutton, J.). Compelled purchases are the most fundamental function of government of any sort, and the fact that the government here allowed its residents additional freedom of choice over these purchases should diminish, not exacerbate, anxieties about federal tyranny.
Governments exist, most fundamentally, to solve collective action problems. Core governmental functions, like the provision of domestic peace, enforceable property rights, national defense, and infrastructure, are assigned to government because the market fails to produce optimal levels of such public goods.[13] Since public goods are enjoyed by all, most individuals refuse to purchase them themselves, hoping instead that they can free-ride when someone else does. By forcibly collecting tax revenue and using it to purchase public goods, governments are able to solve this collective action problem. Thus, at root, governments are formed precisely to compel purchases of public goods.
Because hospitals are required to stabilize the uninsured, the uninsured are able to pass along much of the cost of their health care to the insured.[14] Solving this problem, as the Act attempts to do, creates a public good: lower prices for health services for all citizens. Thus, the Act compels the purchase of a public good, just as the federal government does when it collects taxes and uses it to fund national defense.
Indeed, it is undisputed that Congress would have had the power under the Taxing and Spending Clause to raise taxes and use increased revenues to purchase and distribute health insurance for all. It seems quite odd that Congress’s attempt to enhance individual freedom by allowing citizens to make their own purchase decisions would give rise to such bloated concerns about a federal power grab. Cf. Thomas More, 651 F.3d at 565 (Sutton, J.) *448 (“Few doubt that Congress could pass an equally coercive law under its taxing power....”).
As for the broccoli mandate appellants fear, I have explained at several points why nothing I have written would authorize it. But I note that mandating the purchase (but not the consumption, which would raise serious constitutional issues) of broccoli in order to bolster the broccoli market would, in practical effect, be nothing new. Since the time of the Founding Fathers, when Alexander Hamilton called for federal subsidies for domestic manufacturers, the federal government has used tax revenues to subsidize various industries. See Algonquin SNG, Inc. v. Federal Energy Administration, 518 F.2d 1051, 1061 (D.C.Cir.1975) (“From earliest days, the tariff authority given Congress by the Constitution has been understood to apply to the ‘protective tariff sponsored by Alexander Hamilton, a measure focused ... on the ‘non-revenue purpose’ of protecting domestic industry against foreign competition.”), rev’d by Federal Energy Administration v. Algonquin SNG, Inc., 426 U.S. 548, 96 S.Ct. 2295, 49 L.Ed.2d 49 (1976). Though centralized subsidies are far more efficient than purchase mandates—which is why a broccoli mandate is purely fantastical—they are, in effect, the same. Since they, too, are clearly within Congress’s power under the Taxing and Spending Clause, allowing broccoli purchase mandates would not increase federal power. For these reasons, I find appellants’ fears to be unfounded. I would reject their novel and unsupported suggestion that Commerce Clause jurisprudence ought to discriminate among regulated persons according to the amount of effort or resources they have expended in a given economic arena. Under seventy years of well-settled law, it is enough that the behavior regulated (whether characterized as activity or inactivity) substantially affects interstate commerce. Appellants can cite neither case nor constitutional text for their proposed activity/inactivity distinction. They can explain neither why it ought to be relevant to my Commerce Clause analysis nor why it ought to impel courts to ignore seventy-year-old law that takes a wholly different approach. And they cannot even provide a sufficiently concrete definition of “activity” and “inactivity” to allow courts to reliably apply their distinction. Because I find the individual mandate to be within the bounds of Congress’s commerce power defined by Wickard, Lopez, Morrison, and Raich, I would reject appellants’ Commerce Clause challenge.
VII. Employer Mandate
Appellants also challenge the Affordable Care Act’s employer mandate, arguing that it is not a proper exercise of Congress’s power under the Commerce Clause. I disagree.
It is well settled that Congress may regulate terms of employment under the Commerce Clause. See United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding minimum wage and overtime provisions of the Fair Labor Standards Act); NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (upholding National Labor Relations Act of 1935, which forbid unfair labor practices); cf. Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (regulating employer retirement plans and preempting state regulations under the Commerce Clause); id. at § 1082 et seq. (setting minimum funding standards for employer retirement plans). This is true, of course, of employers “engaged [solely] in intrastate commerce,” so long as Congress could reasonably find that their intrastate activities (considered in the aggregate) substantially *449 affect interstate commerce. Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 537, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); accord Darby, 312 U.S. at 118-119, 61 S.Ct. 451; Jones & Laughlin, 301 U.S. at 36-38, 57 S.Ct. 615.
Appellants do not challenge Congress’s finding that “employers who do not offer health insurance to their workers gain an unfair economic advantage relative to those employers who do provide coverage” and contribute to a negative feedback loop in which “uninsured workers turn to emergency rooms for health care which in turn increases costs for employers and families with health insurance,” making it more difficult for employers to insure their employees. H.R.Rep. No. 111-443(11), at 985-86 (2010), 2010 U.S.C.C.A.N. at 507. Nor do appellants dispute the fact that this amounts to a substantial effect on interstate commerce. Instead, they attempt to distinguish the employer mandate from the wage and overtime provisions in Darby and the fair labor practices in Jones & Laughlin and argue that the mandate compels “private employers [to] enter into a contract with other private parties for a particular product.” Appellants’ Br. 25.
These arguments fail. Appellants cannot convincingly distinguish Darby or Jones & Laughlin. They repeatedly suggest that regulated employers must be involved in interstate commerce; but, as explained above, it is well settled that employers who conduct only intrastate business may be regulated under the Commerce Clause so long as their economic activities, considered in the aggregate, substantially affect interstate commerce. Appellants emphasize the Court’s observation in Jones & Laughlin that the National Labor Relations Act “does not compel agreements between employers and employees.” Id. at 27, 57 S.Ct. 615 (quoting Jones & Laughlin, 301 U.S. at 31, 57 S.Ct. 615). Neither does the employer mandate: like the minimum wage and overtime provisions upheld in Darby, it merely requires that employment agreements contain certain terms (or that the employer pay a penalty).
Appellants attempt to distinguish Darby by arguing that “the wage and hour provisions in Darby ... did not prescribe what must be contained within the employment contract, other than setting a floor for wages and a ceiling for hours.” Appellants’ Br. 28. But the employer mandate, too, only “set[s] a floor”: it requires employers to offer employees “the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan,” but employers are free to select any plan (or create their own) and provide any level of coverage above the “minimum essential” level, the mandate’s “floor.” 26 U.S.C. § 4980H(a)(l).
Appellants’ only other objection to the employer mandate is that it allegedly forces employers to contract with third parties. This is untrue: employers are free to self-insure, and many do. See Employee Benefit Research Inst., Health Plan Differences: Fully-Insured vs. Self-Insured (2009) (reporting that 55% of employees with health insurance were enrolled in self-insured plans in 2008); Christina H. Park, Div. of Health Care Statistics at the Nat’l Ctr. for Health Statistics, Ctrs. for Disease Control and Prevention, Prevalence of Employer Self-Insured Health Benefits: National and State Variation, 57 Med. Care Res. & Rev. 340, 352 (2000) (finding that 21% of all private-sector employers who offered health benefits offered a self-insured health plan in 1993; 49% of employees were enrolled in self-insured plans). Even if employers were compelled to enter the market to purchase health insurance, appellants’ objection would fail for the very *450 reasons I would reject their similar challenge to the individual mandate.
VIII. Religious Exemptions
Appellants also allege violations of the Free Exercise Clause, the Religious Freedom Restoration Act of 1993, the Establishment Clause, and equal protection. The Act makes two religious exemptions: a religious conscience exemption and a health-care sharing ministry exemption. 26 U.S.C. § 5000A(d)(2). The former exempts members of a recognized religious sect in existence since December 31, 1950 who are “conscientiously opposed to acceptance of the benefits of any private or public insurance which makes payments in the event of death, disability, old-age, or retirement or makes payments toward the cost of, or provides services for, medical care.” Id § 1402(g)(1). The latter exempts members of a “health care sharing ministry”—a non-profit organization in existence since December 31, 1999 with members who “share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs and without regard to the State in which a member resides or is employed.” Id § 5000A(d)(2)(B)(ii).
Appellants claim that these exemptions are “religious gerrymanders” demonstrating that the Act itself is hostile to certain religions, Appellants’ Br. 45, and further that the exemptions themselves are unconstitutional under the Establishment and Equal Protection Clauses. For the following reasons, I reject these arguments.
A. Free Exercise Clause
Appellants allege that the Act compels them to violate their “sincerely held religious beliefs against facilitating, subsidizing, easing, funding, or supporting abortions” and prohibits the University from “providing health care choices for employees that do not conflict with the mission of the University and the core Christian values under which it and its employees order their day to day lives.” Second Am. Compl. ¶ 142; Pls.’ Opp’n 36. This argument is unavailing.
“[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).” Dept. of Human Res. of Or. v. Smith, 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Appellants claim that the Act is not neutral because its religious exemptions are “the type of ‘religious gerrymanders’ that the Supreme Court warned against in Lukumi.” Appellants’ Br. 45 (quoting Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993)). They are not. In Lukumi, the Supreme Court struck down city ordinances after finding that “[t]he record in this case compels the conclusion that the suppression of the central element of the Santería worship service was the object of the ordinances.” 508 U.S. at 534, 113 S.Ct. 2217. Here appellants never allege that “the object of [the Act] [wa]s to infringe upon or restrict practices because of their religious motivation.” Id The Act is a neutral law of general applicability and so does not violate the Free Exercise Clause.
B. Religious Freedom Restoration Act
I also reject the claim that application of the individual mandate to appellants would run afoul of the Religious Freedom Restoration Act of 1993 (RFRA). The RFRA directs that the “Government shall not substantially burden a person’s exercise of *451 religion even if the burden results from a rule of general applicability,” unless the Government “demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-1.
If appellants had plead sufficient facts to demonstrate a substantial burden to their exercise of religion, I would be forced to consider the relevance of the RFRA to a subsequent act of Congress. Cf. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (applying RFRA to enforcement of pre-RFRA provisions of the Controlled Substances Act). But appellants have not.
To survive the Government’s 12(b)(6) motion to dismiss, appellants’ complaint must “provide the grounds of [their] entitlement to relief,” which “requires more than labels and conclusions.” Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks omitted). “[C]onclusory” allegations are “not entitled to be assumed true.” Ashcroft v. Iqbal, 556 U.S. 662, 681, 129 S.Ct. 1937, 1951, 173 L.Ed.2d 868 (2009). Unless appellants’ allegations “nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed.” Twombly, 550 U.S. at 570, 127 S.Ct. 1955.
Here appellants merely alleged that the individual mandate will force them to violate their “sincerely held religious beliefs against facilitating, subsidizing, easing, funding, or supporting abortions.” Second Am. Compl. ¶ 142. Nowhere does the complaint explain how the Act would do this. The Act contains provisions to ensure that federal funds are not used for abortions (except in cases of rape or incest, or when the life of the woman would be endangered), see Affordable Care Act § 1303; see also Exec. Order No. 13,535 of Mar. 24, 2010, 75 Fed.Reg. 15,599 (implementing Section 1303’s abortion restrictions), and that each state’s health benefit exchange will include at least one plan that does not cover (non-excepted) abortions, see Affordable Care Act § 1334(a)(6). Without additional or more particularized allegations, I cannot say that appellants’ complaint makes it plausible that the Act “substantially burdens [their] exercise of religion.” 42 U.S.C. § 2000bb-l(b).
C. Establishment Clause and Equal Protection
Appellants also challenge the Act’s religious exemptions themselves, claiming that they violate the Establishment Clause and equal protection because “they grant preferred status only to certain religious adherents.” Appellants’ Br. 45. I disagree. Like the “permissible legislative accommodation of religion” upheld by the Supreme Court in Cutter v. Wilkinson, the Act’s exemptions alleviate “government-created burdens on private religious exercise,” “do[ ] not override other significant interests,” and neither “confer[ ] ... privileged status on any particular religious sect, [nor] singlet ] out [any] bona fide faith for disadvantageous treatment.” 544 U.S. 709, 719-23, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).
The religious conscience exemption simply incorporates the exemption created by section 1402(g)(1), which has survived every Establishment Clause challenge to it over the last forty years. See, e.g., Droz v. Comm’r, 48 F.3d 1120, 1124 (9th Cir.1995); Hatcher v. Comm’r, 688 F.2d 82, 83-84 (10th Cir.1979); laggard v. Comm’r, 582 F.2d 1189, 1190 (8th Cir.1978); Palmer v. Comm’r, 52 T.C. 310, 314-15 (1969). For the reasons set out by our sister courts in *452 these cases, I would reject appellants’ Establishment Clause challenge to the Act’s exemptions.
The exemptions easily survive appellants’ equal protection challenge as well. Legislation comports with equal protection requirements so long as it employs “a rational means to serve a legitimate end.” City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). And “where individuals in the group affected by a law have distinguishing characteristics relevant to interests the [legislature] has the authority to implement, the courts have been very reluctant ... to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.” Id. at 441-42, 105 S.Ct. 3249. Here Congress could have reasonably believed that members of groups that provide health care to their members are less likely to require public medical care, and thus less likely to produce the externalities the Act was designed to diminish. And Congress could have reasonably believed that if it did not limit these exemptions to groups formed prior to a pre-enactment date, individuals who simply wished to avoid the individual mandate would form groups that insincerely claimed the required religious beliefs. Thus the distinctions Congress drew in the Act’s religious exemptions accord all equal protection under the law.
IX. Conclusion
For the foregoing reasons, I would hold that the AIA does not deprive federal courts of jurisdiction to adjudicate the constitutionality of the Affordable Care Act. I would further hold that each of appellants’ challenges to the Act lacks merit and that, specifically, both the individual and employer mandates pass muster as legitimate exercises of Congress’s commerce power.
Regrettably, my fine colleagues in the majority perceive a jurisdictional bar in this case that simply is not there. Accordingly, I respectfully dissent.

. Although appellants also requested declaratory relief, the Declaratory Judgment Act “enlarged the range of remedies available in the federal courts but did not extend their jurisdiction.” Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); In re Leckie Smokeless Coal Co., 99 F.3d 573, 582 (4th Cir.1996). In any case, the Declaratory Judgment Act expressly excludes claims "with respect to Federal taxes.” 28 U.S.C. § 2201(a). The Supreme Court has held this exclusion to be "at least as broad as the Anti-Injunction Act.” Bob Jones Univ. v. Simon, 416 U.S. 725, 732 n. 7, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974).

. This question of statutory interpretation is wholly distinct from the constitutional question concerning Congress's power under the Taxing and Spending Clause, U.S. Const. art. I, § 8, cl. 1, to enact these mandates. Because I would hold the Act constitutional under the Commerce Clause, I need not and do not reach the latter issue.

. The majority attempts to sidestep this conflict, nicely arguing that the Act “did not authorize the collector to make an assessment under his general revenue authority” because "it converted him into a federal prosecutor.” Ante p. 406. But the constitutional failings of the Act does not change the fact that the Commissioner would be collecting the challenged tax "under his general revenue authority.” The Act did not provide any separate mechanism for the assessment and collection of this tax, or even expressly assign those duties to the Commissioner; it simply stated that "a tax shall be assessed ... and collected ... in double the amount now provided by law" from those illegally manufacturing or selling alcohol. Thus, the Commissioner could only perform such assessments and collections under the “general revenue authority” granted by the Internal Revenue Code. 41 Stat. at 318. That such assessments violated due process does not change the fact that the revenue officers doing the assessment would be acting "under color of their offices.” Ante p. 402 (internal quotation marks omitted).

. This was the view of the dissenting opinion in Lipke, which relied on George. See Lipke, 259 U.S. at 563, 42 S.Ct. 549 (Brandéis, J., dissenting) ("The relief should therefore be denied, whatever the construction of section 35, tit. 2, of the Volstead Act, and even if it be deemed unconstitutional. Compare Bailey v. *429 George, 259 U.S. 16, 42 S.Ct. 419, 66 L.Ed. 816, decided May 15, 1922.").

. Indeed, the rigidity of the majority’s approach prompts a reminder that we confront here the court’s statutory jurisdiction, not its Article III jurisdiction. Congress grants, and Congress restricts, as it chooses, the statutory jurisdiction of the lower federal courts.

. In this regard, Justice O’Connor nicely captured the essential purpose of the AIA when she declared: "The AIA ‘deprives] courts of jurisdiction to resolve abstract tax controversies. ...’ ” South Carolina v. Regan, 465 U.S. 367, 386, 104 S.Ct. 1107, 79 L.Ed.2d 372 (1984) (O'Connor, J., concurring in the judgment); and see id. at 392, 104 S.Ct. 1107 ("the Act generally precludes judicial resolution of all abstract tax controversies ...”). The essential issues presented in this case are about as far from "abstract tax controversies” as one can get.

. The majority focuses on Helwig's use of the phrase "with reference to,” suggesting that Helwig would have us consider Congressional direction here only if it is expressly labeled as being made “ 'with reference to’ the AIA.” Ante 404 n. 5. But that very sentence in Helwig goes on to describe such direction as "any declaration by Congress affecting the manner in which the provision shall be treated.” 188 U.S. at 613, 23 S.Ct. 427 (emphasis added). The following citations to "statute after statute” which the majority references are part of the Court’s analysis, the Court tells us, because it must determine whether the "words [employed by Congress] are not regarded by Congress as imposing a penalty and [thus] should not be so treated by the court,” for "[i]f it clearly appear that it is the will of Congress that the provision shall not be regarded as in the nature of a penalty, the court must be governed by that will.” Id. I do not mean to suggest that Helwig teaches that "an exaction’s label controls,” ante p. 404 n. 5, only that any Congressional direction that indicates "the will of Congress” on the application of the AIA should be considered.

. The majority believes the "fundamental problem with this argument is that the Secretary still does 'claim' that the challenged exaction is a 'tax,' albeit one authorized by the Constitution’s Taxing Clause.” Ante pp. 405-06 n. 7. As Snyder is discussing the use of the word "tax” in the precursor to the modern AIA, I read Snyder to refer to the Commissioner’s designation with respect to the statute.

. I do not suggest that "we [should] infer from § 6665(a)(2) a categorical exclusion from the term 'tax’ of all non-Chapter 68 penalties.” Ante p. 407 (emphasis added). Rather, the fact that Congress has directed us to treat some "penalties” as "taxes” simply makes it less likely that Congress desired this result where it enacted no such direction (and in fact expressly rejected the term "tax” for the term "penalty”).

. Justice Powell summarized the history of the AIA as follows, in part:
[T]he Court’s unanimous opinion in Williams Packing indicates that the case was meant to be the capstone to judicial construction of the Act. It spells an end to a cyclical pattern of allegiance to the plain meaning of the Act, followed by periods of uncertainty caused by a judicial departure from that meaning, and followed in turn by the Court's rediscovery of the Act’s purpose.
Bob Jones Univ., 416 U.S. at 742, 94 S.Ct. 2038. Rediscoveries of congressional intent abound in the law and should not surprise us.

. Cf. 42 U.S.C. § 18091(a)(2)(A) ("In the absence of the [individual mandate], some individuals would make an economic and financial decision to forego health insurance coverage and attempt to self-insure....”). Because individuals who self-insure are unable to shift risk in the way that market insurance does, self-insurance is far more common among collectives or businesses, where it may be efficient. See generally M. Moshe Porat, Uri Spiegel, Uzi Yaari, Uri Ben Zion, Market Insurance Versus Self Insurance: The Tax-Differential Treatment and Its Social Cost, 58 J. Risk & Ins. 657 (1991); Patrick L. Brockett, Samuel H. Cox, Jr., and Robert C. Witt, Insurance Versus Self-Insurance: A Risk Management Perspective, 53 J. Risk & Ins. 242 (1986); Isaac Ehrlich, Gary S. Becker, Market Insurance, Self-Insurance, and Self-Protection, 80 J. Pol. Econ. 623 (1972).

. It is no coincidence that "voluntary” or ''voluntarily” appears twenty-eight times in appellants’ briefs.

. See generally R.H. Coase, The Lighthouse in Economics, 17 J.L. & Econ. 357, 357-360 (1974); Paul A. Samuelson, The Pure Theory of Public Expenditure, 36 Rev. Econ. & Statistics 387 (1954). Public goods are goods that are "non-rival” and "non-excludable.” "Non-rival” means that enjoyment of the good by one citizen does not reduce the enjoyment by another; "non-excludable” means that all citizens will enjoy the good once it is produced—none can be excluded. See, e.g., John P. Conley & Christopher S. Yoo, Nonrivalry and Price Discrimination in Copyright Economics, 157 U. Pa. L.Rev. 1801, 1805-11 (2009).

. In the language of economics, the failure to obtain insurance has “negative externalities”—negative effects on those not responsible for the decision.